# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>DAMIAN ANKETELL,<br><br>       Debtor<br>───────────────<br>DAMIAN ANKETELL,<br><br>       Plaintiff<br><br>v.<br><br>TIMOTHY SMITH and THERESA DIPIRO,<br><br>       Defendants<br>───────────────<br>TIMOTHY SMITH and THERESA DIPIRO,<br><br>       Plaintiffs<br><br>v.<br><br>DAMIAN ANKETELL,<br><br>       Defendant | Chapter 7<br>Case No. 15-11362-FJB<br><br><br><br>Adversary Proceeding<br>No. 15-1117-FJB<br><br><br><br>Adversary Proceeding<br>No. 15-1124-FJB |

## MEMORANDUM OF DECISION

### I.    Overview

In or around October 2014, Timothy Smith and Theresa DiPiro (the "Smiths") hired Ground Up

Construction, Inc. ("Ground Up Construction"), which was owned and operated by the chapter 7 debtor,

Damian Anketell ("Anketell"), to perform an extensive renovation on their home in Newburyport,

Massachusetts.  In or around April 2015, after running out of funds, Anketell and Ground Up

Construction abruptly stopped work on the Smiths' renovation leaving the home with an exposed roof

and no heating on the second floor.  The Smiths subsequently contacted their credit card company to

request a refund of certain payments made to Ground Up Construction.  Days after halting work on the

Smiths' home, Anketell filed a chapter 7 petition commencing the present bankruptcy case.  On the

same day the petition was filed, the Smiths' credit card company refunded the requested payments to

the Smiths.

Anketell subsequently filed a complaint (and later an amended complaint) against the Smiths

alleging a violation of the automatic stay based on the refunded credit card payments.  The Smiths, in

turn, filed a complaint against Anketell seeking a determination that a debt owed to them by Anketell

arising out of the failed renovation is excepted from discharge under 11 U.S.C. § 523(a)(2) and (a)(6).

The Court consolidated the two adversary proceedings for pre-trial and trial purposes and held a two-

day trial.  The Court now makes the following findings and rulings and on the basis thereof, concludes

that Anketell's amended complaint against the Smiths shall be dismissed on its merits and that any

amounts owed by Anketell to the Smiths are excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

## II.    Procedural History

On April 6, 2015, the Smiths commenced a civil action against Anketell, Ground Up Construction,

and others in Essex Superior Court.  On April 8, 2015, Anketell filed a petition for relief under chapter 7

of the Bankruptcy Code, commencing the present bankruptcy case.  Anketell's petition listed two "co-

debtors" that each separately filed chapter 7 petitions on the same day as Anketell: Ground Up

Construction and Castle Hill Properties, LLC ("Castle Hill Properties").  The filing of the bankruptcy

petitions stayed the litigation in Massachusetts Superior Court as to the three chapter 7 debtors.

On April 28, 2015, the Smiths filed an adversary complaint naming Anketell, Ground Up

Construction, and Castle Hill Properties as defendants and stating twelve counts arising under

Massachusetts law.  The Smiths eventually stipulated to a dismissal without prejudice of this initial

complaint.

On June 16, 2015, Anketell and Ground Up Construction each filed separate complaints against the Smiths for determinations of alleged violations of the automatic stay.  Anketell amended his complaint prior to the Smiths filing an answer, and Ground Up Construction later agreed to the dismissal of its complaint without prejudice.  Anketell's amended complaint alleged that the Smiths had made certain prepetition payments to Anketell's electronic "PayPal" account.  The amended complaint further alleged that the Smiths caused refunds of these payments to occur sometime after Anketell had filed his chapter 7 petition or that they failed to take reasonable steps to prevent the refunds upon learning of the bankruptcy petition.  After Anketell amended his complaint, the Smiths filed a motion to dismiss the amended complaint.

On June 29, 2015, the Smiths filed a complaint against Anketell setting forth the nondischargeability counts under 11 U.S.C. § 523(a)(2) and (a)(6) as well six counts seeking various relief under Massachusetts law.

On October 21, 2015, the Court held a status conference in both of the present adversary proceedings.  On the same day, the Court held a hearing on the Smiths' motion to dismiss Anketell's amended complaint.  Following the hearing, the Court denied the Smiths' motion to dismiss and consolidated the two adversary proceedings for pretrial purposes.

On November 24, 2015 the Smiths' attorney moved to withdraw.  At a subsequent hearing on the motion to withdraw, the Smiths' explained that they could no longer afford to pay their attorney in light of the cost of an anticipated trial.  The Smiths stated that they would represent themselves at trial. The Court allowed the motion to withdraw, and the Smiths have since proceeded *pro se* in these matters.

On February 9, 2016, Anketell moved for summary judgment on the nondischargeability counts of the Smiths' complaint against Anketell.  Prior to trial, the Court denied this motion.  Also prior to trial, the Court dismissed the state law counts of the Smiths' complaint without prejudice to those counts

3

being renewed in an appropriate forum at an appropriate time.  Accordingly, what remained for

adjudication at trial were the two nondischargeability counts of the Smiths' complaint and Anketell's

amended complaint against the Smiths for a determination of a violation of the automatic stay.

The Court held a two-day consolidated trial in both adversary proceedings.  Following the trial,

the parties submitted proposed findings of fact and conclusions of law and returned to the Court to

deliver closing arguments.  After closing arguments, the Court took both matters under advisement.

## III.    Findings of Fact

The Smiths own and reside in a house in Newburyport, Massachusetts with their three

daughters.  In or around the summer of 2014, the couple sought to hire a contractor to perform an

extensive renovation on their home.  They reached Anketell and his business, Ground Up Construction,

through the website HomeAdvisor.

Ground Up Construction is a Massachusetts corporation that Anketell caused to be incorporated

in or around 2012.  At all relevant times, Anketell has been the sole owner and operator of Ground Up

Construction.  Up to the time of the bankruptcy filing, Anketell operated a construction business

through Ground Up Construction.

Castle Hill Properties is a Massachusetts limited liability company that Anketell caused to be

organized in or around 2012.  At all relevant times, Anketell has been the sole member and operator of

Castle Hill Properties.  Through Castle Hill Properties, Anketell attempted to run a so-called "flipping"

business by purchasing properties, renovating them, and then selling them.

In or around the summer of 2014, Anketell visited the Smiths' house multiple times to evaluate

the project and to prepare a bid to do the work.  Through multiple conversations, the Smiths explained

to Anketell that they sought to raise the roof of the house, to build a dormer, to move a stairway, and to

add a playroom, office, and extra bedroom.

During these meetings, Anketell told the Smiths that he was an experienced home improvement contractor with a rapidly expanding business.  Anketell falsely told the Smiths that he had performed jobs of a similar scope to that of their proposed project.  Anketell falsely told the Smiths that he had five to ten other construction jobs currently scheduled and that if they moved quickly, he could fit them into his increasingly busy schedule.  Anketell also falsely told the Smiths that he had earned $2.5 million in revenue over the past year from other home improvement projects.  Anketell disputes the falsity of these representations and he testified to their validity at trial.  I do not find Anketell to have been credible.  The Smiths demonstrated the falsity of the above representations at trial by a preponderance of the evidence.

Anketell provided the Smiths with a proposed contract (the "Contract") on behalf of Ground Up Construction near the end of August 2014.  Through the Contract, Anketell offered that Ground Up Construction would complete the project for a total price of $111,293.01.  The Contract required an initial deposit of $38,952.00 (approximately 35% of the total amount due), a $27,823.00 payment due on the first day of demolition (approximately 25% of the total amount due), a $27,823.00 payment due once framing and rough construction were completed (approximately 25% of the total amount due), and a final $16,695.00 payment due upon completion of the project.[1]  The Contract did *not* contain a provision that any funds paid by the Smiths to Ground Up Construction were to be designated or segregated solely for use on the Smiths' project.

The Smiths who had met with multiple contractors ultimately signed the Contract with Ground Up Construction on October 13, 2014, relying on Anketell's representations that he had extensive experience as a contractor, that he had performed jobs of similar scope to their project, that he had several other construction jobs scheduled and that he could squeeze them into his schedule, and that he

---

[1] The $0.01 difference between the project price and the total of the scheduled payments appears to be an oversight in the Contract.

had earned $2.5 million in revenue over the past year.  The Smiths relied on these representations in

making a determination that Anketell was a competent and experienced contractor.

Anketell contacted the Smiths multiple times in the days after October 13, 2014 to ensure that

the Smiths promptly paid their initial deposit.  On October 17, 2014, the Smiths wired $38,952.00 to the

Ground Up Construction checking account.  Prior to this wire transfer, Ground Up Construction's

checking account had a balance of only $960.17 despite Anketell's representation that he had earned

$2.5 million in revenue over the prior year.

In the days following the $38,952.00 wire transfer, the Smiths attempted unsuccessfully to

contact Anketell multiple times to discuss the start of their project.  The Smiths began to worry when

they could not reach Anketell for multiple days following the wire transfer, especially after he had been

in frequent contact prior to the payment of this initial deposit.  The Smiths were eventually able to

contact Anketell's construction foreman who was unable to provide any explanation for Anketell's

whereabouts.  After some questioning from Mr. Smith, the foreman told the Smiths that he had never

worked on any job as large as the Smiths' project or on any $100,000-plus job with Anketell.  The Smiths

eventually learned that Anketell had undergone major surgery on or around October 17.

Anketell contacted the Smiths on or around October 22, 2014.  Mr. Smith told Anketell over the

telephone that he and his wife had developed serious doubts about Anketell's ability to complete the

project.  Mr. Smith told Anketell, "[w]e want our money back."[2]  Anketell responded that the Smiths had

signed a contract and that they could not back out of the project without breaching the Contract.

Anketell also stated falsely that he could not give the deposit back because he had purchased materials

for the project and that he had paid money to an architect.  The Ground Up Construction checking

account records indicate that over $15,000.00 was spent between October 17, 2014 and October 22,

---

[2] At trial, Mr. Smith testified credibly that he made this demand of Anketell.  Anketell testified that Mr. Smith never
asked for the Smiths' money back.  I do not find Anketell's testimony credible.  I credit the testimony of Mr. Smith
on this point, and I make the above finding on the basis thereof.

2014 with no substantial influx of funds other than the Smiths' deposit.[3]  However, Anketell's own

accounting of the use of funds on the Smiths' project, which was admitted into evidence at trial, reveals

that David Jaquith, the architect on the project, was not paid anything until November 2014 and that no

materials were purchased for the Smiths' project prior to January 2015 at the earliest.  In other words,

Ground Up Construction, at Anktell's direction, had already spent over $15,000.00 of the Smiths' deposit

by the time Mr. Smith asked for the money back, just not on anything related to the Smiths' project.  In

reliance on Anketell's false claims that he had already purchased materials and paid the architect, the

Smiths reluctantly agreed to move forward with the project.

On or around November 16, 2014, Anketell paid an initial $1,000.00 retainer to David Jaquith,

the architect on the Smiths' project, with a check from Ground Up Construction's checking account.  As

Jaquith credibly testified at trial, this $1,000.00 was the first payment Jaquith received for his work on

the Smiths' project contrary to Anketell's misrepresentation to the Smiths that he had paid the architect

back in October.  Jaquith came to the Smiths' house to take measurements on or around November 18,

2014, following which he began working on the architectural drawings for the project.

As of November 24, 2014, the Ground Up Construction checking account had a negative balance

despite the Smiths having paid the $38,952.00 initial deposit just over a month earlier and despite no

work having been performed on the Smiths' project other than the visit from the architect.  Some of

these funds were spent on outstanding expenses of Anketell's past Castle Hill Properties projects.

In January 2015, Jaquith completed the architectural drawings for the Smiths' project, and

Anketell came to Jaquith's office at that time to pick up the drawings.  Although Jaquith expected to be

paid upon completion of the architectural drawings, Anketell told Jaquith that he had forgotten to bring

his checkbook and left with the drawings without paying the balance of Jaquith's fee.

---

[3] The only credit to the Ground Up Construction checking account during this period outside of the Smiths'
$38,952.00 deposit was a $35.38 refund of a purchase from the Home Depot in Salem, Massachusetts.

On or around February 4, 2015, in anticipation of the start of demolition, the Smiths wrote a check to Ground Up Construction for $14,000.00.  On or around February 12, 2015, Anketell paid Jaquith the balance of his $2,312.80 total fee nearly a month after picking up the architectural drawings.

At some point prior to the start of demolition on the Smiths' project, the foreman who had spoken with the Smiths back in October stopped working for Ground Up Construction.  Anketell then approached Chris LeBlanc, a general contractor whom Anketell had known since high school, to come work on the Smiths' project.  Anketell and LeBlanc had previously discussed becoming business partners.  They decided to work together on the Smiths' project as a trial run to test how a potential partnership might work.  At trial, Anketell testified that LeBlanc became a co-owner of Ground Up Construction.  Anketell's testimony on this point is contradicted by LeBlanc's credible testimony that he never became a co-owner, by Anketell's later testimony that no stock was ever transferred to LeBlanc, and by the schedules and statements that Anketell signed under the pains and penalties of perjury listing Anketell's 100% interest in Ground Up Construction.  Accordingly, I do not find Anketell to be credible on this point, and I have found above that Anketell was the sole owner and operator of Ground Up Construction at all relevant times.  At Anketell's direction, Ground Up Construction hired LeBlanc to work as a general contractor and site supervisor for the Smiths' project to be paid on an hourly basis.

I have found above that Anketell's representation to the Smiths that he had five to ten other constructions jobs scheduled was false.  LeBlanc credibly testified at trial that Ground Up Construction had no construction jobs scheduled other than the Smiths in or around 2015.  Additionally, the Ground Up Construction bank account statements show minimal incoming funds other than the Smiths' various payments from late fall of 2014 into the beginning months of 2015.

Due to winter weather, Ground Up Construction did not start demolition on the Smiths' project until early March 2015.  Anketell disputes this point, and he testified at trial that demolition began in February.  I do not find Anketell credible on this point.  The Smiths and LeBlanc testified that demolition

began in March.  I credit the testimony of the Smiths and LeBlanc on this point, and I make the above finding on the basis thereof.

In order to complete the Contract installment due at the start of demolition, the Smiths made payments to Ground Up Construction of $1,300.00 and $6,200.00 by check on March 17, 2015, and the Smiths made a credit card payment of $6,232.00 on March 20, 2015.  In order to accept the $6,232.00 credit card payment, Anketell opened an electronic PayPal account.

Framing and rough construction on the Smiths' project began on or around March 18, 2015. Ground Up Construction hired Paul Lance, a contact of LeBlanc, to perform the framing.  On or around March 23, 2015, Anketell contacted the Smiths to tell them that the project was moving along faster than expected and would likely be completed in eight weeks rather than the expected ten weeks. Anketell asked the Smiths to make an additional payment in anticipation of the completion of framing and rough construction at which time the next payment of $27,823.00 would become due under the terms of the Contract.  At the time Anketell made this request for additional funds, Ground Up Construction again had a negative balance in its checking account despite the Smiths having made payments in February and March totaling $27,732.00 and having made total payments on the project of approximately $66,684.00.  On or around March 25, 2015, the Smiths paid Ground Up Construction $11,130.00 by credit card to the PayPal account Anketell had opened, bringing the total amount the Smiths had paid on the project to $77,814.00.

Also, on or around March 25, 2015, the Smiths signed a promissory note with respect to all future payments owed under the Contract.  The Smiths agreed to pay all future amounts due under the Contract, a total of $33,387.00, to Ground Up Construction at an interest rate of 10 percent over a thirty-six month period.

On or around the night of March 30, 2015, Anketell called the Smiths and informed them that he was having "liquidity problems" and needed more funds.  The Smiths informed Anketell that they had

already paid $11,130.00 ahead of schedule and that they did not have any more funds to advance at that time.  Anketell assured the Smiths that his liquidity problems would not affect the completion of their project.  As of March 30, 2015, the Ground Up Construction checking account had a balance of $178.00.

Around this time, Chris LeBlanc was given access to the Ground Up Construction bank account records and learned of the company's financial condition.  By looking at the bank records, LeBlanc learned that the funds the Smiths had initially paid in October had been spent by the end of November before any significant work had been performed.  He also learned that the Smiths' subsequent payments had been quickly spent and that Ground Up Construction did not have sufficient funds to complete the Smiths' project.  On or about April 1, 2015, LeBlanc, as site supervisor, halted work on the project and called a meeting with the Smiths and Anketell in order to inform the Smiths of the company's lack of funds.

On April 3, 2015, LeBlanc and Anketell met with the Smiths in the Smiths' home.  During the meeting, LeBlanc provided the Smiths with Ground Up Construction's bank statements and insisted that Anketell explain that the company was out of funds to complete the project.  Anketell told the Smiths that while he was currently out of funds, he intended to restructure his business and to take out a loan to finish the Smiths' project.  LeBlanc did not believe that Anketell was being truthful.  As he testified at trial, "[i]t just seemed to be one more lie on top of a fistful of lies."  When the meeting concluded, LeBlanc handed the Smiths a note he had written during the meeting stating that Anketell was a "compulsive liar" who had spent all of their money.

Following the April 3, 2015 meeting, Ground Up Construction stopped all work on the Smiths' project.  At that time, framing and rough construction had not been completed.[4]  Half of the roof was

---

[4] At trial, Anketell testified that framing and rough construction had been completed before Ground Up Construction stopped work on the Smiths' project.  The Smiths, Chris LeBlanc, and Paul Lance all testified to the contrary, and I make the above finding on the credible testimony of these witnesses.

left exposed to the elements and had to be covered with a tarp.  The windows had not yet been

installed and the interior plywood partitions were not complete.  The HVAC system in the attic that

provided the heat on the second floor of the house was left disconnected.

Later on April 3, 2015, following the meeting with Anketell and LeBlanc, the Smiths called their

credit card company to seek a refund of the payments they had made to Ground Up Construction by

credit card.  These payments included the $6,232.00 payment on March 20 and the $11,130.00 payment

on March 25.

At some point after the April 3, 2015 meeting, Paul Lance, the framer, returned to the Smiths'

home and enclosed the walls and the roof from the elements.  He was never paid by Ground Up

Construction for this additional work.

On April 6, 2015, the Smiths commenced a civil action against Anketell, Ground Up Construction,

and others in Essex Superior Court.  On April 8, 2015, Anketell, Ground Up Construction, and Castle Hill

Properties all filed chapter 7 petitions.  Anketell filed his petition at 5:47 P.M.  Also, on April 8, 2015, the

Smiths' credit card company credited back the $6,232.00 payment and the $11,130.00 payment to the

Smiths.

IV.    **Jurisdiction**

The first matter before the Court is a complaint under 11 U.S.C. § 523(a) to determine the

dischargeability of a debt.  The second matter is a complaint under 11 U.S.C. § 362 to determine a

violation of the automatic stay.  Both matters arise under the Bankruptcy Code and in a bankruptcy case

and therefore fall within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing

order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  They are core

proceedings.  28 U.S.C. § 157(b)(2).  This Court accordingly has authority to enter final judgment in both

matters.  28 U.S.C. § 157(b)(1).

V.      **Discussion**

   A.   **Count I of the Smiths' Complaint – 11 U.S.C. § 523(a)(2)**

         i.   **Applicable Law**

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).  In order to establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must prove each of the following elements by a preponderance of the evidence: "1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; 2) the debtor intended to deceive; 3) the debtor intended to induce the creditor to rely upon the false statement; 4) the creditor actually relied upon the misrepresentation; 5) the creditor's reliance was justifiable; and 6) the reliance upon the false statement caused damage." *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001), citing *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997).

The first element generally requires the debtor to make a false statement with knowledge of its falsity.  *Farley v. Romano* (*In re Romano*), 353 B.R. 738, 767 (Bankr. D. Mass. 2006) (citing *Palmacci*, 121 F.3d at 786–787).  The second element, intent to deceive, refers to the Debtor's mental state and specifically requires a mental state embracing an intent to deceive, manipulate, or defraud.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976); *Palmacci*, 121 F.3d at 786-87.  Intent to deceive may be demonstrated by showing that "a false representation has been made . . . recklessly, careless of whether it is true or false," or, in other words, with reckless disregard for the truth.  *Palmacci*, 121 F.3d at 787 (*citations omitted*).  "Availability of direct evidence to prove a debtor's intent to deceive a creditor is unlikely to be obtained.  The court may infer fraudulent intent from the totality of circumstances*." Danvers Savings Bank v. Alexander*, 427 B.R. 183, 195 (Bankr. D. Mass 2010), citing *Palmacci*, 121 F.3d at 789.  Among the circumstances from which scienter may be

inferred are: the defendant's insolvency or some other reason to know that he cannot pay, his

repudiation of the promise soon after made, or his failure even to attempt any performance. *Palmacci*,

121 F.3d at 789.  Although the inquiries are distinct, in many cases the same factors show both the

debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive. *Faria*

*v. Silva (In re Silva)*, 2014 WL 217889 at *5 (Bankr. D. Mass. 2014), citing *Bellas Pavers, LLC v. Stewart (In*

*re Stewart),* MB 12–017, 2012 WL 5189048 at *8 n. 4 (B.A.P. 1st Cir. 2012).

The final four elements embody the requirement that the creditor's claim must arise directly

from the debtor's fraud.  *Faria*, 2014 WL 217889 at *5, citing *McCrory*, 260 F.3d at 32.  As to the

creditor's reliance, the Supreme Court of the United States has held that § 523(a)(2)(A) requires only

justifiable reliance—a lower standard than reasonableness.  *Field v. Mans,* 516 U.S. 59, 70 (1995).

Reliance is justifiable if the falsity of the representation would not have been readily apparent to the

person to whom it was made.  *Id.* at 70-72.  For purposes of determining whether reliance was justified,

"the circumstances of the reliance claim must be taken into account," and "the individual is not obliged

to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)."

*Lentz v. Spadoni* (*In re Spadoni*), 316 F.3d 56, 59 (1st Cir.2003).

### ii.    Analysis

The Smiths allege that in entering into the contract with Ground Up Construction, they

justifiably relied on several false representations that Anketell made during their initial meetings with

him.  Specifically, they allege that Anketell falsely represented that he had experience completing

construction jobs as extensive as the Smiths' proposed renovation, that he had earned $2.5 million in

revenue over the past year, and that he had between five and ten other construction jobs scheduled but

he could squeeze the Smiths into his schedule if they acted quickly.  At trial, the Smiths credibly testified

that Anketell made these representations and I have so found above.  I have also found above that the

Smiths demonstrated by a preponderance of the evidence that these representations were false.

Anketell's former foreman at Ground Up Construction informed the Smiths that he had never worked on

a project as large as the Smith's renovation with Anketell.  Additionally, Chris LeBlanc testified as to

Anketell's level of experience and the type of jobs he knew Anketell to have performed which were less

extensive than the Smith's project.  The representation regarding the $2.5 million over the year prior to

meeting the Smiths conflicts with Anketell's own testimony that he believed to have earned between $2

million and $3 million dollars since 2012, but it is also quite evidently false when compared to Ground

Up Construction's bank statements which reveal that Ground Up Construction entered October 2014

with less than $1,000 in its checking account. [5]  Finally, Anketell's representation that he had five to ten

other construction jobs scheduled is plainly refuted by the credible testimony of Chris LeBlanc and the

total lack of revenue for Ground Up Construction for the months from late 2014 through early 2015.  For

all these reasons, I find that Anketell made these knowingly false representations in his initial

conversations with the Smiths. [6]

The totality of the circumstances in this case illustrates an intent to deceive that goes far

beyond mere sales puffery.  Anketell intentionally misled the Smiths into believing that he was a

---

[5] Anketell contends that the statement regarding the $2.5 million in revenue is a statement "respecting the debtor's or an insider's financial condition," and is therefore governed by the requirements of § 523(a)(2)(B), including the requirement that such a statement be in writing. I disagree.  The misrepresentation regarding revenue, when coupled with the misrepresentations about performing similar jobs and having other jobs scheduled, goes toward Anketell's proficiency as a contractor.  It is not the type of statement regarding an entity's overall net worth or ability to generate income that courts have generally agreed are excepted from § 523(a)(2)(A) because they fall within the ambit of § 523(a)(2)(B).  *See e.g., In re Cajigas*, 514 B.R. 61, 66 (1st Cir. BAP 2014) (Loan application and supporting documents not within the scope § 523(a)(2)(A)); *Abramov v. Movsovich* (*In re Movsovich*), 521 B.R. 42, 57 (Bankr. D. Mass. 2014) (Representation regarding the overall value of a corporation during negotiations over the purchase of equity not within the scope of § 523(a)(2)(A)) .

[6] The Smiths have also asserted as a basis for nondischargeability under § 523(a)(2)(A) that Anketell falsely told the Smiths that he conducted background checks on all his workers.  The Smiths asserted that this representation was important to them because their three young daughters would be living with them in their home at the time of the renovation.  Anketell admitted at trial to making this representation, but he testified that he did, in fact, conduct background checks on his workers.  The evidence as to whether Anketell actually conducted background checks is equivocal.  While Anketell has provided an ample basis to question the credibility of his testimony, I need not and did not make a specific factual finding as to whether Anketell actually conducted background checks.  Even if Anketell had lied on this point, the Smiths suffered no harm that would have been prevented by Anketell conducting a background check.  In other words, the Smiths have not demonstrated that they suffered any damage as a result of their reliance on Anketell's assertion that he conducted background checks on his workers.

qualified, competent contractor operating a booming business when, in fact, he had never performed a

job the size of the Smiths' proposed renovation, his company stood on the brink of insolvency, and he

had no other construction jobs scheduled.  Prior to the Smiths paying a deposit of $38,952.00, the

Ground Up Construction checking account had a balance of less than $1,000.00.  In barely more than a

month after the Smiths' money hit his company's checking account, Anketell blew through the Smiths'

entire deposit months before anybody swung a hammer at the Smiths' property.  While Anketell had

painted a picture of a thriving construction business, Ground Up Construction's bank records in the

months following the signing of the Contract illustrate a business kept afloat only by the Smiths' periodic

payments.  It is clear that Anketell's false representations were intended to convince the Smiths of his

ability to complete a project that far exceeded his managerial and financial wherewithal.

Anketell's intent to deceive the Smiths can be further inferred by his conduct in later

interactions with the Smiths.  When Mr. Smith requested a return of the initial deposit on or around

October 22, 2014, Anketell falsely stated that he had already purchased materials and paid the project

architect.  As explained in the findings of fact above, Anketell did not pay anything to the architect until

November 2014, and he did not purchase any materials until January 2015 at the earliest.  Anketell had,

in fact, spent over $15,000.00 of the deposit by the time the Smiths asked for their money back, just not

on anything related to the Smiths' project.  Later in March 2015, when the Smiths had paid $11,130.00

ahead of schedule, Anketell went back to the Smiths to request the advancement of more funds.  The

Smiths denied Anketell's request for more funds.  At that time, Ground Up Construction's bank account

balance stood at $178.00, and Anketell must have known that even with more funds from the Smiths,

his chances of completing the project were slim.  This reality was certainly apparent to the site

supervisor, Chris LeBlanc, who forced Anketell to reveal the company's lack of funds to the Smiths when

he gained access to the company bank account around this time.  Anketell's willingness to lie to the

Smiths in October to keep them from walking away from the project and his attempt to squeeze them

15

for more money in March when the project's completion was in serious jeopardy are additional circumstantial evidence of Anketell's intent to the deceive the Smiths in his original misrepresentations. These episodes are indicative of the dishonesty that pervaded Anketell's entire relationship with the Smiths.  For the above reasons, I find that Anketell intended to deceive the Smiths when he knowingly made the above false representations.

I also find that Anketell intended to induce the Smiths to rely on the above misrepresentations in entering into the Contract with Ground Up Construction and that the Smiths actually and justifiably relied on his misrepresentations in entering into the Contract with Ground Up Construction.  Anketell told the Smiths precisely what any homeowner would want to hear from a potential contractor and the falsity of his representations was not readily apparent.  Finally, I find that the Smiths incurred damages as a result of this reliance.  Rather than hiring a qualified contractor, the Smiths were induced to hire Ground Up Construction, which, while owned and operated solely by Anketell, spent the Smiths' funds and abandoned the renovation of the Smiths' home leaving an exposed roof and no heat on the second floor.  Accordingly, I find that the Smiths have established cause to except from Anketell's discharge under § 523(a)(2)(A) any liability of Anketell to the Smiths for the harm or injury they suffered from his having induced them to enter into the Contract with Ground Up Construction, including (without limitation) for fraud, deceit, misrepresentation, breach of contract, unjust enrichment, unfair or deceptive trade practices under MASS. GEN. LAWS ch. 93A, or piercing of Ground Up Construction's corporate veil, and including (again without limitation) consequential damages, punitive damages, double or treble damages under ch. 93A, prejudgment and postjudgment interest, costs, and attorney's fees.

### B.  Count II of the Smiths' Complaint – 11 U.S.C. § 523(a)(6)

#### i.    Applicable Law

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  It requires injury to another "entity," a defined term that includes an individual, *see* 11 U.S.C. § 101(15) (in Title 11, "'entity' includes . . . person"); 11 U.S.C. § 101(41) (in Title 11, "'person' includes individual[. . .]", or to the property of another entity.  In addition, the injury needs to have been both willful and malicious. "Willfulness requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question." *Old Republic Nat'l. Title Ins. Co. v. Levasseur* (*In re Levasseur*), 737 F.3d 814, 818–19 (1st Cir.2013); *see also Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).  "Debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.*, 523 U.S. at 64, 118 S.Ct. at 978.  "Malicious" requires the injury to have been "wrongful," "without just cause or excuse," and "committed in conscious disregard of one's duties." *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir. 1997).  Malice thus has both objective and subjective elements: the injury must have been objectively wrongful or lacking in just cause or excuse; and the debtor must have inflicted the injury in "conscious disregard" of her duties, meaning that she has to have been aware that the act was wrongful or lacking in just cause or excuse*. Burke v. Neronha* (*In re Neronha*), 344 B.R. 229, 231–32 (Bankr. D. Mass. 2006); *Old Republic National Title Ins. Co. v. Levasseur*, 737 F.3d at 818-19 ("An injury is malicious if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will. The injury must have been committed in conscious disregard of one's duties. Willfulness requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question.") (Internal citations and quotations omitted); *Zutrau v. Zutrau* (*In re Zutrau*), 482 B.R. 704, 713 (Bankr. D. Mass. 2012).

ii.   **Analysis**

The Smiths' argument for nondischargeability under § 523(a)(6) is twofold.  First, the Smiths

allege that Anketell acted willfully and maliciously with the knowledge that his actions would harm them

when he fraudulently induced them to advance large sums of money to him.  They argue that Anketell

never intended to complete the project for which they paid him.  Under this theory, Anketell's

acceptance of their payments despite his intent not to perform effectively amounts to conversion.

Second, the Smiths contend that Anketell's use of their payments for purposes other than their project

constituted a willful and malicious injury.  Anketell counters that he did actually intend to the complete

the project, but just ran out of funds.  Anketell concedes using the Smiths' funds for purposes other than

their project, but he argues that the parties never agreed to a segregation of the Smiths' payments for

use only on their project.

As under Count I, the burden on this count lies with the Smiths to establish the elements §

523(a)(6) by a preponderance of the evidence.  I find that they have not met this burden.  As to the first

argument, the Smiths have not established that Anketell did not intend to perform under the Contract.

It is unclear from the evidence that Anketell did not intend to complete the Smiths' project when he

misrepresented his experience and competency as a contractor.  One can reach the equally plausible

conclusion from the evidence presented that Anketell took on a project that was over his head with the

intention and hope, albeit unrealistic given his managerial and financial wherewithal, to complete it.

Had he actually been able to schedule other construction jobs to supplement his revenue stream, it is

possible that he could have completed the Smiths' project.  In sum, while I have found that Anketell

deliberately misrepresented his qualifications in order to get hired, I am unable to find, based on the

record presented, that Anketell intended to injure the Smiths through this same behavior.

As to the Smiths' second argument, the Contract between the parties contained no requirement

that the Smiths' payments be used solely on the Smiths' project.  Anktell's use of funds for other

purposes, including for outstanding expenses from past Castle Hill Properties projects, does not by itself

constitute a willful and malicious injury absent some agreement or duty to the contrary or some further

showing that Anketell never intended to complete the project for which he was paid.  For these reasons,

I find that the Smiths have failed to establish to cause to except any debt from discharge under §

523(a)(6).

      **C.   Anketell's Amended Complaint for Determination of Violation of the Automatic Stay**

            **i.   Applicable Law**

The automatic stay is a collection of stays set forth in 11 U.S.C. § 362(a) that prohibit a variety of

acts against the debtor, property of the debtor, and property of the estate.  Section 362(k)(1) of the

Bankruptcy Code provides redress for violation of the automatic stay.  It states that "an individual

injured by any willful violation of a stay provided by this section shall recover actual damages, including

costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C.

§ 362(k)(1).  A debtor alleging a violation of the automatic stay has the burden to demonstrate, by a

preponderance of the evidence, that a violation of the automatic stay has occurred, that the violation

was willfully committed by the respondent, and that the debtor suffered damage as a result of the

violation.  *In re Panek*, 402 B.R. 71, 76 (Bankr. D. Mass. 2009) (internal citations omitted).

            **ii.   Analysis**

On April 3, 2015, after the meeting at the Smiths' home where the Smiths learned that

construction on their project had stopped and Ground Up Construction lacked the funds to complete

the project, the Smiths contacted their credit card company to seek a refund of certain recent payments

made to Ground Up Construction.  On April 6, 2015, the Smiths brought suit in Massachusetts Superior

Court against Anketell, Ground Up Construction, and others.  On April 8, 2015, the Smiths' credit card

company refunded two payments in the amounts of $6,232.00 and $11,130.00.  On that same date at

5:47 P.M., Anketell filed his chapter 7 petition, at which time the automatic stay went into effect.  At

trial, no evidence was introduced to demonstrate any further action taken by the Smiths to recover these payments.

Anketell alleges in his amended complaint that the Smiths either requested the refunds postpetition or failed to take reasonable steps to prevent the refunds upon learning of the bankruptcy petition. Anketell has the burden of demonstrating, by a preponderance of the evidence, that the Smiths violated the automatic stay. The automatic stay went into effect at 5:47 P.M. on April 8, 2015. Based on the evidence presented, the only action by any party that may have occurred after this time was the Smith's credit card company crediting a refund to the Smith's on April 8, 2015. However, Anketell presented no evidence as to what time this action occurred. Additionally, he has produced no evidence that either the credit card company or the Smiths had notice of the bankruptcy filing at the time the refund was issued. Finally, Anketell has produced no evidence whatsoever of any postpetition act *by the Smiths* to collect, assess or recover their claim against him nor of any other act that would constitute a violation of the automatic stay. Accordingly, I find that Anketell has failed to establish that the Smiths violated the automatic stay.

**VI.    Conclusion**

For the reasons set forth above, the Court will enter separate judgments dismissing Anketell's amended complaint on the merits and declaring that any liability of Anketell to the Smiths for the harm or injury they suffered from his having induced them to enter into the Contract with Ground Up Construction is excepted from Anketell's discharge under 11 U.S.C. § 523(a)(2)(A), including (without limitation) liability for fraud, deceit, misrepresentation, breach of contract, unjust enrichment, unfair or deceptive trade practices under MASS. GEN. LAWS ch. 93A, or piercing of Ground Up Construction's corporate veil, and including (again without limitation) consequential damages, punitive damages, double or treble damages under ch. 93A, prejudgment and postjudgment interest, costs, and attorney's fees.

Date:  March 13, 2017

_____

Frank J. Bailey
United States Bankruptcy Judge